## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

| | |
|---|---|
| INKIES SPORTS, INC. (d/b/a KRYSTAL'S NFL SHOPPE), on behalf of itself and all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> FACEBOOK, INC., ADSAGE CORPORATION, DHGATE.COM, and DOE DEFENDANTS 1-100, <br><br> Defendants. | ) <br> ) CASE NO. <br> ) <br> ) **CLASS ACTION COMPLAINT** <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) JURY TRIAL DEMANDED <br> ) <br> ) |

Plaintiff Inkies Sports, Inc. (d/b/a Krystal's NFL Shoppe) ("Krystal's" or "Plaintiff"), individually and on behalf of a Class (defined below) comprised of all others similarly situated, alleges the following based upon the investigation made by and through its counsel, which included, *inter alia*, a review of relevant public documents, news reports and articles, internet pages and accounts of various witnesses and informants. The Complaint is based upon Plaintiff's personal knowledge at to its own acts, and upon information and belief as to all other matters, based upon the aforementioned investigation.

### SUMMARY OF THE ACTION

1.      This is a class action brought on behalf of retailers and wholesalers of officially licensed National Football League ("NFL") apparel who have been harmed in their business by purveyors of counterfeit goods advertised on internet websites such as Facebook, Inc. ("Facebook").    Plaintiff asserts federal law claims against Facebook, adSage Corporation ("adSage"), internet retailer and wholesaler DHgate.com  ("DHgate.com") and unidentified Doe

Defendants 1-100, based upon the Lanham Act, 15 U.S.C. §§ 1051 *et seq.* and the laws of the State of New Mexico, N.M. STAT. ANN. §§ 57-12-3 *et seq.*

2.      In or before 2011, advertisements for counterfeit NFL merchandise began appearing in "Sponsored" advertisements on Facebook on the right-hand side of Facebook pages. The ads continue to run, with increasing frequency in recent weeks, and are all similar in nature, containing tag lines such as "Jerseys on sale! Only $18.High [sic] quality" and "Nike NFL Jerseys $21." The ads are accompanied by pictures of what appears to any reasonable person to be authentic, officially licensed NFL merchandise. There is no way for a Facebook user to determine from the pictures and the text which accompanies the counterfeiters' ads whether the merchandise is authentic or not. Indeed, as discussed *infra*, the advertisements often use explanations such as "cheap," "sale" and "wholesale," in an attempt to justify the extremely low prices, which are often 80% to 90% lower than the manufacturer's suggested retail price ("MSRP") of officially licensed NFL merchandise. Clicking on the advertisements takes the Facebook consumer to a web page with pictures that appear to depict officially licensed NFL merchandise, along with a mechanism by which to purchase such items. Nonetheless, as discussed in more detail *infra*, the NFL merchandise sold on these websites is neither authentic nor licensed by the NFL. Once an internet user places an order and the goods are shipped, they receive what is immediately identifiable to any reasonable person as counterfeit goods in packaging bearing mailing addresses from locations within the mainland of the People's Republic of China ("China"). Some of these customers complained to Facebook about the advertisements, but received no meaningful response.

3.      Krystal's is an Albuquerque, New Mexico-based retailer that deals exclusively in officially licensed NFL merchandise, such as NFL game jerseys, hats and collectibles. Krystal's revenues are increasingly tied to online sales and online marketing initiatives, including the

advertising of their store and internet website via social media platforms, such as the website administered and owned by Defendant Facebook.  Krystal's maintains a Facebook page in order to update its customers about new merchandise, promotions and community/store events.  In February of 2012, Krystal's also began paying for "Sponsored" ads on Facebook, the same type of ads which the counterfeiters utilize.  Nonetheless, Krystal's discovered that its own marketing efforts were being overshadowed by those of counterfeiters.  Ads for counterfeit goods are regularly displayed on Krystal's Facebook page, leading even loyal customers to question whether these ads are supported, or even sponsored, by Krystal's.  Indeed, Krystal's has received numerous comments and complaints from its customers regarding the advertisements, with consumers relating that because the advertisement was on Krystal's Facebook page, they were *led to believe that Krystal's was somehow responsible for, or in league with, the counterfeiters*. As such, Krystal's has inadvertently been placed in the untenable position of actually lending credence to the counterfeit ads, by virtue of Facebook's display of those advertisements on Krystal's page.  Krystal's has lodged public and private complaints with Facebook, but has received no meaningful reply or response.

4.      The economic impact on Krystal's and other members of the Class of the fraudulent advertisements for illegal goods is undoubtedly material and likely runs into the many millions of dollars.  In a world of low-price internet retail, the lowest price will generally win over consumers, all else being equal.  If consumers believe – albeit mistakenly – that they can order a genuine, NFL licensed jersey for $22, as opposed to the MSRP of $100 to $300, they will understandably choose the cheaper jersey if both appear to be identical.  Part of the willingness to click on such ads may be the credibility that is provided to the counterfeiters via their association with Facebook, a large, respected and technologically state-of-the art firm, and

through their apparent (but false) association with Krystal's and similar well-established retailers.

5.    In recent months these ads for counterfeit NFL jerseys and other merchandise have proliferated.  Advertisements run on Krystal's Facebook page around the clock, waiting to snare unsuspecting visitors.  Once a consumer clicks on one of these advertisements and places an order, the merchandise arrives, postmarked from China, and it becomes immediately apparent that the merchandise is sub-standard and fake.  As part of the investigation into these advertisements, Plaintiff and its agents conducted a number of interviews with people who had purchased counterfeit NFL merchandise after having clicked on a Facebook Sponsored advertisement.  All of the persons, United States citizens, received goods that, once received, were readily identifiable as counterfeit and non-authentic in a parcel postmarked from somewhere in China.  Plaintiff's counsel likewise executed a controlled purchase of a counterfeit NFL jersey and was immediately able to identify the jersey as non-authentic by, among other things, the incorrect stitching, the absence of an authentic hologram (utilized by the NFL and manufacturers to individually number each product to ensure its authenticity) and other tell-tale signs of counterfeiting.

6.    The Chinese government blocks access to a number of social media websites inside China, including Facebook.  Therefore, in order for counterfeiters located in China to advertise their goods to consumers in the United States, an intermediary is required. On information and belief, adSage (a/k/a Yidesiqi or Aidesiqi of adSage Internet marketing & Online Advertising Agency) – an advertising firm with offices in Seattle, Washington – and the retailers they associate with, such as DHgate.com and various Doe Defendants, are responsible for the creation, hosting, posting and funding of the counterfeit ads running on Facebook. AdSage holds itself out as Facebook's only "official partner" in China, helping Chinese citizens

and businesses "open[] accounts" to access the "Facebook advertising network."[1]  Likewise, DHgate.com prides itself on being able to reach the United States and other Western markets through Facebook advertisements – some of them featuring counterfeit goods.  But for the assistance of companies like adSage and DHgate.com, it would be nearly impossible for the counterfeiters to access Facebook in order to advertise and sell their merchandise.

7.    Due to the proliferation of advertisements for counterfeit goods on Facebook, Plaintiff and other members of the Class have been materially harmed, and continue to be harmed, in their businesses.  Plaintiff and other members of the Class have no adequate remedy at law and, absent court intervention, will continue to be harmed.

## JURISDICTION AND VENUE

8.    This Court has original subject matter jurisdiction over the claims made herein pursuant to 28 U.S.C. §§ 1331, 1338, because the claims asserted for false advertising arise under and pursuant to section 1125(a) of the Lanham Act, Title 15 of the United States Code.  This Court also has diversity jurisdiction pursuant to 28 U.S.C. § 1332(d), the Class Action Fairness Act, because the amount of the class action claims set forth herein exceeds $5,000,000 and Plaintiff and Defendants are citizens of different states.   Additionally, this Court has supplemental jurisdiction over claims set forth under the laws of the State of New Mexico pursuant to 28 U.S.C. § 1367.

9.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions which give rise to the claims contained herein occurred in this District and a substantial part of the property that is the subject of this action is situated in this District.

---

[1]    *See* Xu Jieyun, *Facebook, by 3000 adSage pull Chinese business enterprise investment and advertising*, Jing Division, FIRST FINANCIAL DAILY, Feb. 3, 2012, *available at* tech.qq.com /a/20120203/000029.htm (last visited Sept. 11, 2012) (translated from original Chinese (Simplified Han).

## THE PARTIES

10.     Plaintiff Inkies Sports, Inc., doing business as Krystal's NFL Shoppe ("Krystal's"), is a retail seller of officially licensed NFL merchandise, including team jerseys, hats, shirts and other goods. Krystal's is incorporated in New Mexico and is headquartered at 2801 Eubank Blvd. NE, Albuquerque, New Mexico 87112. Krystal's has been in business for almost 30 years and is New Mexico's largest and oldest NFL merchandise store.

11.     Defendant Facebook, Inc. ("Facebook") is located in Menlo Park, California and is incorporated under the laws of the State of Delaware. Facebook operates a social networking website that allows people to communicate and share information with friends and family. It also develops technologies that facilitate the sharing of information.

12.     Defendant adSage Corporation a/k/a Yidesiqi or Aidesiqi or adSage Internet Marketing & Online Advertising Agency), is a Washington corporation with its primary place of business at 10500 NE 8th Street, Suite 1160, Bellevue, WA 98004. AdSage is an online advertising business and, in particular, develops tools and applications for paid advertising through websites such as Facebook and Google. With about 100 highly-skilled engineers, adSage has implemented many data mining projects and software packages for over 3,000 Chinese customers.

13.     Defendant DHgate.com is an online retailer/wholesaler located at 6F Dimeng Commercial Building No. 3, Marietta, PA 17547. DHgate's website describes the company as follows:

> DHgate.com is the leading B2B e-Commerce marketplace that has revolutionized global online trade with China. As the first and largest China-based online wholesale trading platform, DHgate.com has been serving the world's small and medium sized businesses since 2004. Providing world class standards of China wholesale product sourcing, payment, tracking and delivery services to over 3 million buyers from over 230 countries, DHgate.com offers over 20 million product listings at any one time from over 650,000 dedicated China-based suppliers.

About Dhgate, http://help.dhgate.com/help/buyer_about_usen.php (last visited October 8, 2012).

14.    At all times material herein, Defendants Facebook, adSage and DHgate.com have been doing business, and continue to do business, within the State of New Mexico.  Moreover, Defendants' conduct, as alleged herein, was directed at, affected and caused injury to Plaintiff and other members of the Class within the State of New Mexico, as well as across the United States.  All Defendants carried out a joint scheme, business plan or policy in all respects pertinent hereto, and all acts and omissions herein complained of were performed within the course and scope of said relationship.

15.    Plaintiff does not know the true names and capacities, whether individual, corporate, associate, or otherwise, of defendants Does 1 through 100, inclusive.  Plaintiff is informed and believes, and based upon such information and belief, alleges that each fictitious defendant was in some way responsible for, participated in, or contributed to the matter and things of which Plaintiff complains herein, and in some form and under some theory is subject to liability therefore.    When the exact nature and identity of such fictitious defendant's responsibility for, participation in, and contribution to the matters herein alleged is ascertained, Plaintiff will seek leave to amend this Complaint to set forth the same.

16.    Defendants' founders, owners and executive officers directed, authorized, ratified and/or participated in the conduct that gives rise to the claims asserted herein and derived personal financial benefit from such conduct.

17.    Defendants Facebook, adSage, DHgate.com and Doe Defendants 1-100 are referred to collectively herein as "Defendants."

## CLASS ACTION ALLEGATIONS

18.    Plaintiff brings this action as a class action on behalf of itself and all others similarly situated for the purpose of asserting claims alleged in this Complaint on a common

basis.  Plaintiff's Class is defined under Federal Rules of Civil Procedure 23(b)(2) and (3), and

Plaintiff proposes to act as a representative of the following Class comprised of:

> All retail sellers of NFL licensed merchandise in the United States who have
> maintained a presence on Facebook since at least January 1, 2011 (the "Class
> Period"), and who have been damaged by virtue of the fraudulent advertisements
> for counterfeit NFL merchandise that have appeared on Facebook since that date.
> (the "Class").

Excluded from the Class are Defendants, their officers and directors and members of their

immediate families and their legal representatives, heirs, successors or assigns, and any

corporations in which Defendants has or has had a controlling interest.

19.    The members of the Class are so numerous that joinder of all members is

impracticable.  While the exact number of Class members is unknown to Plaintiff at this time

and can only be ascertained through appropriate discovery, Plaintiff believes that there are at

least hundreds of members of the proposed class.  The members of the Class may be identified

from records maintained by Defendant Facebook and/or the NFL and its affiliates and may be

notified of the pendency of this action using one or more forms of notice to those customarily

used in class actions.

20.    By reason of Defendants' wrongful conduct, Plaintiff and the members of the

Class have been harmed, injured and damaged in an amount greater than $5,000,000.

21.    The resolution of this action involves questions of law and fact common to the

Class which predominate over any questions affecting only individual members.  Plaintiff is a

member of the Class it seeks to represent, and its claims are typical of the claims of the other

members of the Class because all members of the Class are similarly affected by the wrongful

conduct alleged in this Complaint.

22.    Plaintiff will thoroughly and adequately protect the interests of the Class, having

obtained qualified and competent legal counsel to represent it and those similarly situated.

23.    The prosecution of separate actions by individual class members would create a risk of inconsistent adjudications and would cause needless expenditure of judicial resources.

24.    Defendants have acted or refused to act on grounds that apply generally to the Class.

25.    A class action is superior to all other available methods for the fair and efficient adjudication of the controversy.

<u>**SUBSTANTIVE ALLEGATIONS**</u>

26.    For some time Facebook has earned substantial revenue from selling advertising targeted at its users.  Facebook helps its clients to create "Sponsored" advertisements and stories, which appear on the right-hand side of each Facebook page.  The revenues generated from these Sponsored ads accounted for 98% of Facebook's total revenue in 2009, 95% in 2010 and 85% in 2011.  Stated in dollar terms, Sponsored ads earned Facebook over $760 million in 2009, $1.87 billion in 2010 and $3.15 billion in 2011.  Accordingly, selling these advertisements is invariably the most important part of Facebook's business.

27.    In recent months Facebook has broadened the reach of its advertisements by introducing a new format of "sponsored stories," which reach those Facebook users utilizing mobile devices, such as Smartphones, to access Facebook.  Facebook also "significantly increased the number of ads on many Facebook pages," and "increased the reserve price (i.e., the minimum price threshold) in [their] advertising auction system."[2]

**A.    *Counterfeit Advertisements Proliferate***

28.    Sometime during or prior to 2011, Sponsored advertisements for counterfeit NFL merchandise began to appear on Facebook users' pages.  The advertisements for counterfeit NFL merchandise seem to appear on Facebook users' pages with more frequency when those users are

---

[2]    Facebook, Inc., Amendment No. 6 to Form S-1 Registration Statement (Form S-1/A), at *53 (May 9, 2012).

viewing related content on Facebook, i.e., text or multimedia concerning the NFL, its franchises

or its merchandise.    The following is an example of an advertisement for counterfeit NFL

jerseys, in the format in which it appears on the typical Facebook page:

**Figure 1**

shared Krystal's NFL Shoppe's photo.







18+ Gamers Only

Build a pirate empire and compete with millions for world domination. Play free now!

1,100,000 people played Battle Pirates.

$20.99 Nike NFL Jerseys

New Styles in Stock. Quality guarantee & Free returns. Retail & wholesale. Shop now!

Verizon Wireless

Get the new Samsung Galaxy S III on America's Largest 4G LTE Network.

FREE A. CAROLLA Audiobook

/ Alert - They're Here! - No Adult sizes, just the 12month upwards - i69.95. First come first served.

nare · 12 minutes ago · 🔒 **Only Me**

29.    As the above screen capture illustrates, a picture of an authentic NFL children's

jersey – that of Robert Griffin III of the Washington Redskins – was shared with this particular

Facebook user.    However, the Sponsored ad on the right-hand side of the screen features

counterfeit jerseys.    The juxtaposition of the authentic jersey and the counterfeit advertisement

adds to consumers' confusion who, as a result, may believe that the two products are identical,

which they are not.    The MSRP of the authentic (children's jersey) on the left is approximately

$70, while the counterfeit jersey is being sold for just $20.99.

30.    As **Figure 1** illustrates, Facebook does far more than simply post advertisements

designed by an advertiser.    Facebook has created a sophisticated system that targets Facebook

users with particular advertisements based upon those users' apparent interests.    In the case of

**Figure 1**, this means that the Facebook user is more likely to see ads for NFL-related merchandise because of the content of the text accompanying the picture and the content of the picture itself, which portrays an officially licensed NFL Nike jersey.    When creating advertisements, the advertisers are encouraged to enter information which narrows down the demographic of the "target" or desired audience.  Among other things, advertisers are asked to identify the location, age, gender, interests, connections and friends of connections of Facebook users that the advertisers wish to target.  Advertisers can also target Facebook users by their "activities," their businesses or careers, their ethnicities, the events they are interested in, whether they use mobile Facebook technology, whether they use Android or iOS mobile technology, what movies they are fans of, what music they listen to and what sports they are interested in.  All of these factors are used by Facebook to assist advertisers in targeting their ads to specific users.

31.    Such precise targeting of particular consumers gives advertisers, such as counterfeiters, a powerful tool by which to target Facebook users viewing the Facebook pages of sellers of legitimate, officially licensed NFL merchandise, so as to take market share away from those sellers and coopt users that are interested in purchasing authentic NFL merchandise.

32.    The pairing of advertisements with the Facebook pages of legitimate entities, including retailers of official NFL merchandise, has the added effect of lending credibility to the counterfeiters' advertisements by implying that the legitimate retailer or user has in some way authorized the advertisement or is responsible for it, which is not the case.  Moreover, because their ads appear on a Facebook page – a trusted and well-respected website – the counterfeiters are able to leverage the credibility that such an association confers.  The success of these ads is illustrated by their proliferation over the past year, with more and more appearing each day. With tag lines such as "Jerseys on sale! Only $18.High [sic] quality" and "Nike NFL Jerseys

$21," even experienced internet users are lured by the idea that they can purchase an official jersey at a steep discount.

33.    Consumers cannot determine whether the counterfeit merchandise being advertised is authentic or not simply by viewing the advertisements.  The images contained in the ads appear to be of officially licensed NFL merchandise, and a consumer has no real way of determining the likelihood that a retailer or wholesaler is selling authentic NFL merchandise at an 80% to 90% discount to MSRP.  Further, when a user clicks on the Facebook advisement, he or she is taken to the counterfeiter's web page, which often fraudulently claims, implies or otherwise suggests that the merchandise being offered is "authentic" or otherwise legitimate, which it is not.  The following, website, available through a link contained in a Facebook advertisement, purports to sell "authentic" NFL merchandise:

///

///

///

///

///

///

///

///

///

///

///

///

///

**Figure 2**

**facebook**

Search for people, places and things

## Ads and Sponsored Stories You May Like

All   Recently viewed   **Sponsored stories**

**Nike Nfl Jerseys Sale**
usajerseysshop.com



The latest、 the best Nike
Nfl jerseys for you, we
provide the best service!

**Dallas Cowboys Fans Only!**
nextag.com



Sale on Dallas Cowboys
Products from Jerseys to
Watches & Bedding.

**Chicago Bears vs Packers**



Chicago Tackles Green
Bay Next Thursday. Bear
Down with New Gear
From FansEdge.com!

**Huge Designer SALE!**
modaqueen.com



80% off on Designer
Handbags, Wallets! While
Supplies Last!

///

///

**Figure 3**



**Figure 3.1**



34.     **Figure 2** above illustrates the way that the advertisement for jerseys sold by this

particular counterfeit goods website, styled usajerseyshop.com, appears on Facebook.  Clicking

on the Facebook advertisement leads a user to the actual website, depicted in **Figures 3 and 3.1** located at http://www.usajerseysshop.com/, which includes the following statement in the "About Us" section of the website:

**Figure 4**

## About Us

Globe-trade Sport  Apparel Co., Ltd in the export of jerseys, ( nfl jerseys,nhl jerseys,mlb jerseys,nba jerseys ) all jerseys are authentic quality .So we rely on the outstanding service and high quality obtain high reputation in USA ,canada. We honor all types of orders, from samples or dropship to wholesale. No order is too small or big. We are interested in long-term business relationship. We offer quick shipping along with tracking for all placed orders.
We will be glad to supply authentic quality  products for you. if you with any questions,please kindly contact us.

http://usajerseysshop.com/34-c-About-Us/ (last visited September 12, 2012) (emphasis added, errors in original).   As **Figure 4** illustrates, the counterfeiters know that consumers may be concerned that they are getting authentic merchandise when the prices are so low.   Statements like this seek to – and do – assuage the fears of consumers, that is, until they receive the merchandise, which is clearly counterfeit.

35.    While a complete list of counterfeit websites is impracticable to compile – mainly because these sites change names on a regular basis in order to dodge angry customers and frustrate the efforts of law enforcement and investigators – the following websites have, within the last month, placed Sponsored advertisements on Facebook and have been selling counterfeit NFL merchandise to Facebook customers:

        a)        http://www.nflfootballfans.net/ ("nflfootballfans.net");

        b)        http://www.usajerseysshop.com/ ("usajerseyshop.com");

        c)        http://www.nflnhlshopnet.com/ ("nflnhlshopnet.com");

        d)        http://www.superbjerseys.com/ ("superbjerseys.com");

        e)        http://www.bestjerseysshow.com/ ("bestjerseysshow.com");

f)    http://www.grandjerseys.com/ ("grandjerseys.com");

g)    http://www.newjerseycome.com/ ("newjerseycome.com");

h)    http://www.stores.junjersey.com/ ("stores.junjersey.com");

i)    http://www.wholesalenfljerseyse.com/ ("wholesalenfljerseyse.com");

j)    http://official-nfl-jerseys.us/ ("official-nfl-jerseys.us");

k)    http://official-nflstore.us/ ("official-nflstore.us");

l)    http://www.nistore.co/jersey.html ("nistore.co");

m)    http://jerseys33.com/ ("jerseys33.com");

n)    http://www.cheapnflbuy.com/ ("cheapnflbuy.com");

o)    http://www.snapjerseys.com/ ("snapjerseys.com");

p)    http://newlyjersey.com/ ("newlyjersey.com");

q)    http://www.ilikejerseys.com/ ("ilikejerseys.com");

r)    http://www.nikenewnfljerseys.com/ ("nikenewnfljerseys.com");

s)    http://www.nfljerseys-shop.us/ ("nfljerseys-shop.us");

t)    http://www.nfljerseyspromo.com/ ("nfljerseyspromo.com");

u)    http://www.jerseyssale.cc/ ("jerseyssale.cc");

v)    http://www.jeroutlets.info/ ("jeroutlets.info");

w)    http://www.jerseysmall2012.com/ ("jerseysmall2012.com");

x)    http://www.55usd.com/ ("55usd.com");

y)    http://www.nbashoe.com/ ("nbashoe.com");

z)    http://www.cheapjerseysmvp.com/ ("cheapjerseysmvp.com")

aa)    http://www.nikenfl.us/ ("nikenfl.us").

As evinced above and below, many of these sites – all of which are currently advertisers on

Facebook – have names and designs that directly and intentionally mimic the names and designs

of legitimate websites in a concerted effort to deceive consumers.    Indeed, many of the counterfeit seller websites identified above are intentionally designed blatantly imitate the look, feel and design of the official NFL online store, http://www.nflshop.com/ ("NFL Shop").  **Figure 5** is a screen capture of the official NFL Shop website, while **Figure 6** is a counterfeiter's website, http://official-nflstore.us/.

**Figure 5**



///

///

///

///

///

///

///

///

///

///

///

**Figure 6**



36.    As **Figures 5 and 6** reflect, the authentic NFL website (**Figure 5**) is, for all intents and purposes, indistinguishable from the counterfeiter's website (**Figure 6**).  Therefore, even experienced internet users could be fooled into thinking that the jerseys they are ordering are coming from – if not the NFL itself – an entity associated with the NFL.  Instead, the jerseys are being offered for sale by cunning counterfeiters, located in mainland China.  In fact, as reflected in Figure 6, the counterfeiter's website goes so far as to attempt to entice children to purchase their illicit products by using the caption "BACK TO SCHOOL COLLECTION" along with links to counterfeit NFL, NHL and MLB merchandise.

37.    The internet is rife with accounts of unsuspecting consumers being fooled into purchasing what they thought to be officially licensed NFL merchandise from websites that

turned out to be maintained by counterfeiters.  A number of recent news stories have illustrated

the breadth of the problem, such as this story which appeared in The Washington Post:

> If Facebook sees slower user growth and lower site engagement due to a sinking reputation, that's very bad news for the company, which relies almost exclusively on ads for its revenue.
>
> One issue that could be further exacerbating the trust issue is the appearance of counterfeit ads on the site.
>
> Social media marketer Eric Feinberg began noticing ads for counterfeit merchandise on his legitimate marketing pages. The prevalence of the ads prompted Feinberg to start an organization called Fans Against Kounterfeit Enterprise, or FAKE, which aims to educate users about the ads.
>
> Since then, he's conducted experiments to prompt the appearance of counterfeit ads by posting particular pictures or mentioning certain brands on Facebook pages. In the past seven months, he's cataloged 7,000 ads that lead to fake merchandise. He regularly reports the ads to Facebook, and has contacted the company, but was told that Facebook could only act if they received complaints from copyright or trademark owners.
>
> When asked about the counterfeit ads, a Facebook spokeswoman said the company acts quickly to take down ads that violate its ad guidelines and has a team dedicated to monitoring those ads.
>
> "At Facebook, we strive to create a trusted environment for our users and advertisers. We offer the ability for users to provide immediate feedback on our ads and encourage them to report anything they find offensive or misleading," she said.
>
> * * *
>
> [I]f the ads continue, they could raise some red flags for the social network, said Bradley Shear, a social media lawyer who has seen Feinberg's results.
>
> "I find it troubling that this amount of ads are showing up," Shear said. "If consumers are confused as to what's real merchandise and what's counterfeit merchandise, that could create tremendous legal liability for Facebook."

Hayley Tsukayama, *Facebook shares down ahead of earnings report*, THE WASHINGTON POST,

July 26, 2012, *available at* http://www.washingtonpost.com/business/technology/facebook-

shares-down-ahead-of-earnings-report/2012/07/26/gJQAdUFjBX_print.html (last visited Aug.

13, 2012).

38.     Facebook has failed to take any measures to curb or stop the placement of fraudulent and illegal ads on its website, opting instead to grow revenues by adding additional counterfeiters each day to its roster of advertisers.  This is despite constructive and actual knowledge that fraudulent advertisements for illegal merchandise are proliferating on Facebook user's pages.

39.     It is critical to understand that Facebook is not merely a passive party in the counterfeiters' scheme.  Indeed, Facebook does far more than simply post the "Sponsored" advertisements that appear on its site. Instead, as discussed *supra*, depending on the nature of the goods or services that the advertiser wishes to sell, Facebook helps and encourages advertisers to target their advertisements at specific, very detailed categories of Facebook users.   In this respect, Facebook is not like a daily newspaper that runs generally viewed advertisements for local services providers, some of whom may later prove to be unlicensed or incompetent. Instead, Facebook employs sophisticated data mining technology to assist the counterfeiters in undercutting legitimate retailers by serving advertisements to users that would normally purchase officially licensed goods—often showing users advertisements for counterfeit goods on the same page that the official retailers use to sell legitimate merchandise.

40.     In an article entitled, "Facebook 'likes' ad bucks from Chinese Counterfeiters," Fox News observed that these ads are big business for the Chinese counterfeiters, and Facebook's collection of personal information on its users allows the counterfeiters to target users with "surgical" precision.  As the article states, in pertinent part:

> Facebook's lucrative ability to target ads based on what users post on their pages is fueling big sales for Chinese companies that peddle knockoff jerseys and other counterfeit merchandise, one watchdog group alleges.
>
> Collecting users' personal data for marketing and advertising purposes gives web-based companies such as Google, Facebook and Twitter a powerful advertising pitch: Companies can surgically target consumers who have already expressed an

interest in their products. But turning that technology over to foreign companies who profit from counterfeit gear is tantamount to helping them steal, say critics.

"They're following our keywords and conversations," Eric Feinberg, founder of advocacy group Fans Against Kounterfeit Enterprise [FAKE], told FoxNews.com. "My public data is being shared with illegal enterprises -- and that bothers me."

Feinberg's group has tracked how ads promoting knockoff sports gear such as Peyton Manning jerseys and fake handbags have popped up on members' Facebook pages within minutes of relevant posts. The company's targeted software allows clients to create advertisements for a hyperfocused audience by sifting through user's interests and even comments posted on a timeline. A hashtag can also be added to search criteria to target users with similar interests.

"I started noticing specific ads back in February," Kay'Lee Wells, also with Fans Against Kounterfeit Enterprise, told FoxNews.com. She noticed knockoff Louis Vuitton handbag ads on her newsfeed page a day after changing her timeline cover to an image of a retail location of the designer brand. "Whenever I changed my cover photo or made comments about certain things they would pop up."

Officials at the social networking site maintain that they do not sell user information to any advertisers, who are allowed only to choose demographic targets when posting an ad.

"At Facebook, we strive to create a trusted environment for our users and advertisers," a spokeswoman for Facebook said in a statement to FoxNews.com. "We offer the ability for users to provide immediate feedback on our ads and encourage them to report anything they find offensive or misleading."

While Facebook's policy states that no counterfeit goods are allowed to be advertised or sold, experts say the company is not doing enough to uphold its own rules and guidelines. But the spokeswoman could not explain how Facebook ad space has gotten into the hands of known foreign sellers of counterfeit goods, such as Warmcounter.co.in, jerseyseeker.com and zerojersey.com.

"We have a team dedicated to investigating ads and user complaints, and we will remove ads that users bring to our attention if they violate our ad guidelines," she said.

Professional sports leagues, which control licensing of their official paraphernalia, and designers of high-end handbags have long battled the bootleg manufacturers, which sell their wares at a fraction of the cost of officially sanctioned gear.

"We are very aggressive in protecting our fans from being duped into buying inferior merchandise. These sites offer too-good-to-be-true items, only to provide fans with inferior and laughable merchandise," said Brian McCarthy, a spokesman for the National Football League.

The Justice Department is taking notice too, seizing $1.5 million from banks made off the sale of counterfeit goods May 11, following a U.S. Immigration and Customs Enforcement (ICE) investigation of several Chinese websites selling counterfeits handbags, athletic apparel, sunglasses and more.

Perry Chiaramonte, *Facebook 'likes' ad bucks from Chinese Counterfeiters, Group Alleges,* FOXNEWS.COM, June 11, 2012, *available at* http://www.foxnews.com/tech/2012/06/11/facebook-likes-ad-bucks-from-chinese-counterfeiters/ (last visited Aug. 13, 2012).

41.    Plaintiff Krystal's itself played a very critical role in uncovering one counterfeit jersey website fraud and took measures to make amends to one of the victims, even though Plaintiff had no responsibility to do so.  As the following news story entitled "Dealer Saves the Day in NFL Jersey Scam" reflects, in February of 2012, the family of a soldier stationed in Afghanistan purchased what it thought was an official NFL jersey from a counterfeiter's website, only to find that the jersey was a fake and that their gift was unusable.  When Plaintiff Krystal's was made aware of the situation, it: (a) confirmed that the jersey the victim purchased from a Chinese counterfeiter was indeed a forgery; and (b) offered to provide an official jersey to the serviceman's family free of charge:

**Real present for New Mexico GI will be delivered**

ALBUQUERQUE (KRQE) - It had all the markings of an authentic NFL jersey and the price was certainly high enough.

Still, an Albuquerque woman says she was duped out of nearly $200 on a present for her son-in-law fighting in Afghanistan.

But then a local business stepped in to help.

"This is as good of fake as I've seen," co-owner Andy Hageman of Krystal's NFL Shoppe said.

It's the hottest jersey on the market, so it's no wonder why Reina Brown was ready to spend $184 on what was advertised as an authentic Denver Broncos Tim Tebow jersey for her son-in-law serving in Afghanistan.

Her daughter found an online company, and Brown reached for her credit card.

"She said, 'Mom, I found one. It's called the Denver Bronco Authentics,'" Brown said.

But the product didn't stand up to its name, and it didn't take Brown long to realize, "I've been taken."

She said the first clue was the packaging: the jersey was shipped in from China.

When she brought it in to Krystal's, the evidence piled up.

"The first thing that we spotted was the fact that the stitching of the jersey where the name Tebow is a very weak single stitch," Hageman said. It should be triple-stitched, he added.

The emblem compared to one on an authentic jersey is almost a match, but the darker, messy stitching is a giveaway.

While the tag is almost identical, the hologram is all wrong.

"First of all, the logo, the hologram is the wrong shape," Hageman said. "The NFL officially licensed hologram is a square hologram."
But getting a refund is almost impossible.

"We went to the website, and it said it didn't exist," Brown said.

The soldier's wife had to tell him it wasn't coming.

"He's wanted a jersey since then, and he was finally going to get that," Danielle Lovato said. "I didn't send him anything at all."

That's when Hageman stepped in saying the soldier would get his gift, an authentic jersey this time, and he would send it out

"That pretty much brought me to tears when he said that," Brown said.

Hageman said authentic Tebow jerseys have been sold out since December because Reebok gave up the contract to Nike and stopped making them.

Nike's version will come out in April, that's when the soldier's jersey will be sent to him.

In the meantime Brown is fighting to get the charge off her credit card.

Crystal Gutierrez, *Dealer Saves The Day in NFL Jersey Scam*, KRQE NEWS 13, Feb. 15, 2012,

*available at* http://www.krqe.com/dpp/news/business/dealer-saves-the-day-in-nfl-jersey-scam

(last visited Sept. 12, 2012). The website that Reina Brown purchased the jersey from,

http://www.denverbroncosauthentic.com/ is no longer in existence, likely due to the publicity generated by Plaintiff's attempts to make the situation right for Ms. Brown and her son-in-law, who was still in Afghanistan at the time.[3]

42.    Plaintiff Krystal's later made good on its promise to Ms. Brown and her son-in-law, presenting Sergeant Phillip Lovato with the first officially licensed Peyton Manning Denver Broncos jersey that the store received from Nike.   KRQE NEWS 13 Albuquerque reported the news in a story entitled "Soldier Gets 1st Manning Broncos Jersey in NM":

> ALBUQUERQUE (KRQE) - A long wait is over for a New Mexico soldier.
>
> Six months after his mother-in-law thought she bought him an authentic Denver Broncos football jersey while he was fighting in Afghanistan, he received the real thing Thursday.
>
> In February, Reina Brown spent $184 on what she thought was a real Tim Tebow jersey online, but it turned out to be a fake.
>
> So Krystal's NFL Shoppe stepped in and promised to get Brown's son-in-law, Phillip Lovato, a real Tebow jersey. However he was then traded to the New York Jets.
>
> On Thursday, the shop gave Lovato an authentic Peyton Manning Broncos jersey.
>
> Lovato is now the only person in New Mexico to own one.
>
> "The first Peyton Manning jersey in New Mexico makes me very happy," Sgt Phillip Lovato said. "I'm excited. There's a lot of controversy in it in getting rid of Tebow, but I think it's good and it makes me very excited."
>
> Lovato's wife and their twins also got jerseys of their own Thursday.

Dick Knipfing and Jessica Garate, *Soldier Gets 1st Manning Broncos Jersey in NM*, KRQE NEWS 13 Albuquerque (Aug. 13, 2012), *available at* http://www.krge.com/dpp/news/military/nm-solider-gets-1st-manning-broncos-jersey (last visited October 9, 2012).

---

[3]    The website http://www.denverbroncosauthentic.com was in use up until February of 2012, registered to the internet protocol "IP" address 173.252.210.161.

43.     Similarly, Ralf E. Lanier, a resident of Florida and a fan of the Miami Dolphins and the University of Florida Gators, was also deceived into purchasing counterfeit jerseys from a Chinese retailer with a convincing website.  On or about August of 2011, Mr. Lanier's Facebook page displayed numerous advertisements for 'cheap NFL jerseys' on his Facebook page in August of 2011.  After clicking on one of the advertisements, Mr. Lanier was taken to a website, where he purchased two jerseys, each at a price of approximately $45, buying a Miami Dolphins Marshall jersey for his son and a Tim Tebow Florida Gators "throwback" jersey for himself.  When Mr. Lanier received the jerseys it was immediately clear to him that he had been the victim of a fraud.  The jerseys, shipped to his residence in Florida, were postmarked from mainland China and had the tell-tale signs of fakes, such as:  (a) ragged stitching in the seams; (b) the absence of a number hologram, which would have been included on the tag of a legitimate jersey; and (c) wrong-sized logos appearing on the jersey.

44.     Such stories are not uncommon, and the federal government has begun to take notice, taking down websites that offer fake jerseys and interdicting shipments.  However, such efforts often fail to stop the counterfeiters, who simply create a new domain name and continue advertising their wares on Facebook and selling them to United States consumers.  For example, in July, officials from the United States Immigration and Customs Enforcement ("ICE") shut down about 70 websites that were selling counterfeit jerseys, only to have more take their place:

**Feds crackdown on websites allegedly selling fake NFL jerseys**

SALT LAKE CITY — A shipment of apparently fake NFL jerseys intended for a Sandy man were central to a nationwide investigation into websites that offer cheap professional sports gear and other items.

Homeland Security Investigations and U.S. Immigration and Customs Enforcement filed documents in U.S. District Court in Salt Lake City in May to seize seven Internet sites through which NFL, MLB, NBA, NHL and NCAA team jerseys are sold. Six of the sites' registered agents are in China, one is in Malaysia.

On Thursday, federal authorities said the Salt Lake investigation is part of Project Copycat, a national ICE-led crackdown targeting websites selling a wide array of counterfeit goods, such as baby carriers, language and fitness DVD sets, clothing and jewelry. The jerseys were being sold by so-called "copycat" websites, which mimic the look of legitimate retail websites, federal officials said.

In all, the operation shut down 70 websites across the country including nflshopjerseys.com, nflshopjerseys.net and nflshop18.com. Authorities said many of the sites so closely resembled legitimate ones that it would be difficult for even discerning consumers to tell the difference.

"This operation targeted criminals making a buck by trying to trick consumers into believing they were buying name brand products from legitimate websites when in fact they were buying counterfeits from illegal but sophisticated impostor sites located overseas," ICE director John Morton said in statement.

"The impostor sites were simply a fraud from start to finish and served no purpose other than to defraud and dupe unwary shoppers."

Investigators also found that many of the websites had secure socket layer or SSL certificates, which duped consumers into think the sites were legitimate. The certificates provide authentication for financial information and encrypt credit card numbers, user names, passwords and other sensitive data.

"Utah is home to many innovative companies and entrepreneurs who understand the importance of protecting intellectual property," said U.S. Attorney for Utah David B. Barlow. "These cases are also about ensuring that the goods Utahns spend their money on come from legitimate sources, and from companies that use safe materials and practice fair labor standards."

U.S. Customs and Border Protection agents in Anchorage, Alaska, last fall intercepted a package from Shanghai, China, containing 41 NFL jerseys and one Major League Baseball jersey. The parcel was en route to a Sandy address.

An NFL intellectual property specialist examined photos of the jerseys and determined the stitching, patches and holographic stickers were knockoffs, according to court documents.

A Homeland Security agent interviewed a Sandy man who admitted to placing the order through nflshopjerseys.com but insisted he didn't know the merchandise was counterfeit. The site offers deeply discounted authentic NFL jerseys, according to court documents.

The man provided the agent emails he had exchanged with the company and his purchase order showing he paid $18.50 for each jersey. In all, his bill came to $1,009, including shipping insurance and other fees. Court documents do not implicate the man in a crime.

The Coalition to Advance the Protection of Sports Logos also determined through a sample of five jerseys from the package that the merchandise was fake based on improper labeling, lack of authentic holograms and inferior craftsmanship. The combined value of those five jerseys alone, were they authentic, would have been $1,375, according to court records.

Authorities posted notices on the websites saying the federal government has seized them.

Dennis Romboy, *Feds Crackdown on Websites Allegedly Selling Fake NFL Jerseys*, DESERET NEWS July 12, 2012, *available at* http://www.deseretnews.com/article/print/865558933/Feds-crackdown-on-websites-allegedly-selling-fake-NFL-jerseys.html (last visited July 12, 2012).

45.     Efforts such as those taken by ICE in July have done little to curb the illegal activity being conducted through advertisements on Facebook.  In fact, raids on websites may make Facebook advertising more important to the counterfeiters because Facebook lends credibility to their websites and allows them to place an intermediary between themselves and the consumers.  Essentially, the counterfeiters can bootstrap off of the legitimacy of the retailers selling official merchandise on Facebook and Facebook itself to bolster their own illegal activities.

**B.     *Reputational and Economic Harm to Krystal's and Other Members of the Class***

46.     In recent months Krystal's Facebook page has been plagued by Sponsored advertisements from counterfeiters containing tag lines such as "Jerseys on sale! Only $18.High [sic] quality" and "Nike NFL Jerseys $21."  The ads are almost always accompanied by pictures of what appear to any reasonable person to be authentic, officially licensed NFL merchandise. Further, when Facebook users visiting Krystal's official Facebook page see the ads alongside Krystal's company promotions and posts, they are given the mistaken impression that Krystal's has authorized or even sponsored the offending advertisements for counterfeit merchandise.  The following screen captures illustrate the nature of the problem and the reason for the confusion:

Figure 7



The Sponsored ad outlined above links to http://www.cheapnflbuy.com/, identified *supra*, in ¶ 35.

///

///

///

///

///

///

///

///

///

///

///

///

///

**Figure 8**



The advertisement outlined above links to http://jerseys33.com/, identified *supra*, in ¶ 35.

///

///

///

///

///

///

///

///

///

///

///

///

///

**Figure 9**



The advertisement outlined above links to http://www.nflfootballfans.net/, identified *supra*, in

¶ 35.

///

///

///

///

///

///

///

///

///

///

///

///

Figure 10



The advertisement outlined above links to http://www.usajerseysshop.com/, identified *supra*, in ¶¶ 34-35.

47.    As **Figures 7 through 10** illustrate, it is impossible for a Facebook user to determine whether the counterfeit merchandise advertised on the Krystal's Facebook site is authentic NFL merchandise or counterfeit.    Often the advertisements very cunningly use explanations such as "cheap" and "wholesale," in an attempt to justify to United States consumers the extremely low prices.    When a Facebook user clicks on an advertisement he or she are taken to a web page with pictures of what appear to be officially licensed NFL merchandise, along with a mechanism by which to purchase such items.    Nonetheless, once received, the goods are immediately identifiable as counterfeit, bearing mailing addresses from locations within China.    Many consumers have complained to Facebook about the advertisements, but received no meaningful response.

48.    Plaintiff's counsel, as part of its investigation into the claims alleged herein,

tracked advertisements posted on Krystal's page, as well as the websites that are associated with those ads. In order to corroborate information in news reports and victim statements concerning the sale of counterfeit jerseys through those advertisements, Plaintiff's counsel initiated a controlled purchase of merchandise by clicking on one such advertisement, chosen at random, following the link to the counterfeiter's website and purchasing what was represented to be an official NFL licensed jersey from that website. The advertisement that was chosen at random – an ad associated with the website http://www.nflfootballfans.net/ – is depicted in **Figure 9** above. As with other counterfeiters' websites, nflfootballfans.net is a blatant and direct copy of a legitimate retailer's page, which tends to lend to the credibility of the counterfeiter's site. **Figure 11** below is a screen capture of the counterfeiter's website http://www.nflfootballfans.net/:[4]

**Figure 11**



---

[4]    It should be noted that the counterfeiter's website, nflfootballfans.net, is an almost exact copy of the website of the legitimate retailer of official NFL products, http://www.fanatics.com/. Indeed, the counterfeiters have appropriated the exaggerated "F" logo of Fanatics and used it for their own at http://www.nflfootballfans.net/. *See* Figure 12.

As referenced above, the counterfeiter's website is virtually indistinguishable from a legitimate retailer's page. The only real difference is the price of the counterfeit goods being offered for sale.

     49.    Once at the counterfeiter's website, counsel located a Chicago Bear's jersey, which bore the number 34 of the "Late Great Walter Payton." The jersey is what is termed a "throwback" jersey, bearing the number of a retired player. The NFL licenses "throwback" jerseys, which are sold as new through many legitimate retailers, including Plaintiff Krystal's.

**Figure 12**



As **Figure 12** reflects, the listed price of the jersey on the counterfeiter's website was $18, far less expensive than comparable, officially licensed NFL jerseys.

50.    Payment was made on August 20, 2012 through the nflfootballfans.net website, using PayPal, a popular online payment tool.  The total charge for the jersey was $44.94, including:  (i) $18.00 for the jersey; (ii) $20.00 for shipping; (iii) $4.00 for an "Insurance Fee"; and (iv) $2.95 for a "Pay Fee".  Confirmation of the order was sent via email, bearing the identifier "Powered by Zen Cart."  The receipt on the PayPal website identified the recipient of the payment not as nflfootballfans.net, but as "陈 宇超," (which may be translated into English as "Chen Yu") with the email address "cyc9955@gmail.com."  The clearly counterfeit jersey arrived approximately 10 days later, bearing a Shanghai, China postmark and via a Chinese shipper, the China Postal Express & Logistics Corporation ("EMS").

51.    Unlike the pictures displayed on the advertisement shown on Krystal's Facebook page, the jersey shipped from nflfootballfans.net was easily identifiable as counterfeit.  Among other things, the stitching on the jersey was in tatters, fraying at the seams and left hanging.  Moreover, the stitching was incorrect and sloppy, as thought it was done quickly and without care.  However, the most obvious indication that the jersey was counterfeit was the lack of a valid hologram and identifying number which is included on each authentic NFL jersey.  Most strikingly, the hologram used on the jersey is:  (a) dull and grainy, not colorful and sharp; (b) the wrong style for a Reebok jersey sold anytime after 2006; and (c) bears incorrect or missing logos on the helmets displayed on the hologram.  Any one of these defects would be sufficient to identify the jersey as a fake, but all three make it a certainty.

52.    Counterfeiters have gone to great lengths to fool consumers in the United States into thinking that counterfeit jerseys are authentic.  In an attempt to combat this problem, Krystal's has posted a number of warnings concerning the Facebook ads and the proliferation of

websites selling fake jerseys, but many customers nevertheless call and email Krystal's to complain that they are unable to tell if the Facebook ads on Krystal's Facebook page are for authentic or counterfeit goods. Many other customers are likely purchasing goods directly from the counterfeiters, unwittingly buying fakes while believing that what they are purchasing are official, NFL-licensed merchandise.

53.    Krystal's and other retailers have been plagued by ads for counterfeit merchandise, with the sheer volume of such ads seemingly multiplying geometrically in recent weeks. Sponsored ads featuring counterfeit merchandise are viewed by customers or potential future customers on Krystal's Facebook page 24 hours per day. The "Sponsored" nature of the advertisements leads unsuspecting consumers to believe that Krystal's is involved or complicit with the counterfeiters. As a result, customers and potential customers may draw the conclusion either: (a) that the counterfeiters are selling official merchandise; or (b) that Krystal's also sells cheap, unauthorized and counterfeit NFL merchandise. Nothing could be further from the truth, but such conclusions are necessarily injurious to Krystal's and its business.

54.    Additionally, the situation will likely get much worse before it gets better, due to Facebook's recently unveiled expanded advertising strategy. Facebook announced on August 20, 2012 that it would be placing Sponsored ads in results from searches conducted through the Facebook website. As such, instead of organic search results (i.e., pages of friends and/or businesses such as "NFL") being returned when a user enters a search, users will now be shown Sponsored advertisements, such as those sponsored by the counterfeiters and described *supra*. What's more, the Sponsored search results ads will be virtually indistinguishable form organic search results, with the exception of an "X" that will appear in the "upper right corner of each ad." Tim Peterson, *Facebook Pushing Further Into Search Ads*, ADWEEK, Aug. 20, 2012, *available    at*    http://www.adweek.com/news/technology/facebook-pushing-further-search-ads-

143005 (last visited Sept. 13, 2012). As Fox Business described, Facebook's move into search

results places the prominent placement of advertisements over user experience and should prove

valuable to advertisers:

> Zuckerberg has long been against intrusive ads affecting the user experience, but
> experts say it is a necessary step for the maturing company as big advertisers
> strain to find tangible benefits from Facebook ads.

> "While Zuckerberg is obsessed with user experience, some brands to their utter
> detriment aren't," said Jan Rezab, CEO of social media analytics company
> Socialbakers.

> As sponsored and promotional stories become more prevalent and seem to be
> showing up more frequently, higher up on the page and right in the middle of
> mobile News Feeds, analysts seem bullish that they will help rejuvenate sales.

Jennifer Booton, *Haunted by Criticism, Facebook Cozies Up to Advertisers*, FOX BUSINESS, Aug.

22, 2012, *available at* http://www.foxbusiness.com/technology/2012/08/21/as-worries-loom-

facebook-cozies-up-to-advertisers/ (last visited Sept. 14, 2012).

55. The costs to Plaintiff and the Class of such counterfeiting are enormous.

Counterfeiting – particularly from China – causes billions of dollars of harm to the United States

economy each year and is growing. The Federal Bureau of Investigation estimates that

counterfeiting causes in excess of $200 to $250 billion per year of economic damage to United

States Businesses. *See* U.S. GOVERNMENT ACCOUNTABILITY OFFICE REP. TO CONG.

COMMITTEES, NO. GAO-10-423, INTELLECTUAL PROPERTY: OBSERVATIONS ON EFFORTS TO

QUANTIFY THE ECONOMIC EFFECTS OF COUNTERFEIT AND PIRATED GOODS at 18 (April 2010),

*available at* http://www.gao.gov/new.items/d10423.pdf (last visited Aug. 13, 2012). However,

that number is an estimate and the actual impact could be much higher. *See id.* Further, while

the precise economic impact may be difficult to measure, other types of harm are not so difficult

to quantify:

> According to experts and literature GAO reviewed, counterfeiting and piracy have
> produced a wide range of effects on consumers, industry, government, and the

economy as a whole, depending on the type of infringements involved and other factors. Consumers are particularly likely to experience negative effects when they purchase counterfeit products they believe are genuine, such as pharmaceuticals. Negative effects on U.S. industry may include lost sales, lost brand value, and reduced incentives to innovate; however, industry effects vary widely among sectors and companies. The U.S. government may lose tax revenue, incur IP enforcement expenses, and face risks of counterfeits entering supply chains with national security or civilian safety implications. The U.S. economy as a whole may grow more slowly because of reduced innovation and loss of trade revenue. Some experts and literature also identified some potential positive effects of counterfeiting and piracy. Some consumers may knowingly purchase counterfeits that are less expensive than the genuine goods and experience positive effects (consumer surplus), although the longer-term impact is unclear due to reduced incentives for research and development, among other factors.

*Id.* at *2.

56.    As the Global Congress on Combating Counterfeiting also explained, counterfeiting's effects are far reaching:

Counterfeiting is generally perceived by society as a victimless crime with 'fakes' simply constituting a cheap alternative purchase, and seen by criminals as having a low risk of prosecution with light penalties relative to the large profits to be made.

The reality is that the international trade in counterfeit products is estimated to exceed six per cent of global trade. It is not only damaging to business and investment opportunities but is also having a negative impact on society and the global economy.

Trade in counterfeit goods is a lucrative and growing area and there is increasing evidence to show that in addition to the historical links between counterfeiting and organized crime, some terrorist groups are now also using this type of trade to finance their activities worldwide.

First Global Congress on Combating Counterfeiting, Fact Sheet (May 25 & 26, 2004), *available at* http://www.ccapcongress.net/archives.Brussels/Filesfsheet5.doc (last visited October 9, 2012).

57.    The economic and competitive impact of the fraudulent advertisements on Krystal's and the other members of the Class is equally as deleterious and undoubtedly runs into the many millions of dollars. Price competition has become fierce and with the advent of easily comparable internet advertisement, retailers and wholesalers alike are forced to compete on one

factor alone:  price.  All other things being equal, when counterfeiters are able to charge 80% to 90% less than legitimate retailers, they have a fierce competitive advantage.  The MSRP of an officially-licensed NFL jersey is approximately $100 to $300.  Fake jerseys tend to sell for anywhere from $17 to $45 dollars.  In order for legitimate retailers to compete with these fakes they must lower their prices, cutting directly into their profit margins.  The fact that Facebook, a respected and widely-used website, assists these counterfeiters in directly competing with legitimate retailers makes an already difficult situation much worse.

58.    For example, if consumers believe – albeit mistakenly – that they can order an official NFL jersey for $22, as opposed to the MSRP of $100 – they will understandably choose the cheaper jersey if both appear to be identical.  As discussed above, a material part of the willingness to click on such ads may be the credibility that is provided to the counterfeiters via their association with Facebook, a large, respected and technologically state-of-the-art firm, and through their apparent (but false) association with Krystal's and other businesses like Krystal's. Conversely, after purchasing low-quality counterfeit NFL merchandise from an ad which appears to be associated with Krystal's a consumer may conclude that Krystal's offers for sale the same fake merchandise, which it most certainly does not.

### C.    AdSage, DHgate.com and the Doe Defendants

59.    As Facebook acknowledged in the SEC filing for its initial public offering ("IPO"), the government of China blocks access to a number of social media websites inside China, including Facebook.  As Facebook's prospectus for the IPO stated:

> Growth trends in MAUs, DAUs, and mobile MAUs are critical variables that affect our revenue and financial results by influencing the number of ads we are able to show, the value of those ads, the volume of Payments transactions, as well as our expenses and capital expenditures. We expect our user growth rates to decline as the size of our active user base increases and as we achieve higher market penetration rates. Additionally, as we grow our business and expand internationally, we expect to face challenges entering new markets such as China, where access to Facebook is restricted in whole or in part. As user growth rates

slow, we expect the rate of growth in revenue will likely decline over time, which will affect our income from operations and net income.

Facebook, Inc., Amendment No. 8 to Form S-1 Registration Statement, at *52 (May 16, 2012).

Indeed, Facebook has reported that it has no plans to enter the Chinese market at this time:

> A Facebook executive has said at a social media conference in Hong Kong that there are no plans for the social network to hit the Chinese market.
>
> Facebook's North Asia director, Jayne Leung, told conference attendees that the social network would not launch in the region any time soon, according to Meld Magazine editor Karen Poh on Twitter.
>
> That statement comes nearly a year after chief executive Mark Zuckerberg expressed similar sentiments. Of course, at that time Zuckerberg also said that Facebook was in no hurry to make a bid for the stock exchange.
>
> Less than six months later, Facebook went public at $38 a share, a price from which it's been sliding ever since.
>
> Speculation has been rife for more than a year that Facebook could attempt a launch in China, which has its own censor-"friendly" social networks, such as Renren and Sina.
>
> But the world's largest social network, which has an estimated 950 million users, is blocked in the country by the Chinese government. Facebook was blocked in 2008 when the site had just 100 million users.
>
> In an S-1 filing with the U.S. Securities and Exchange Commission, as part of the company's bid to file for an initial public offering, Facebook said it did not know if it could "find an approach to managing content and information that will be acceptable to us and to the Chinese government."
>
> It is estimated that China has more than 538 million users online, out of a total population of more than 1.34 billion people.

Zach Whittaker, *Facebook: 'No Plans' to Enter China Anytime Soon*, CNET, Sep. 7, 2012,

*available at* http://www.cnet.com/8301-1023_3-57508107-93/facebook-no-plans-to-enter-china-

anytime-soon/ (last visited Sept. 17, 2012).

      60.    In order for the counterfeiters to advertise their illicit and illegal goods to

consumers in the United States, an intermediary is required. On information and belief, adSage –

an advertising firm with offices in Seattle, Washington – in association with various Doe

Defendants, is responsible for the creation, hosting, posting and funding of the counterfeit ads running on Facebook.

61.    AdSage holds itself out as Facebook's only "official partner" in China, helping Chinese citizens and businesses "open[] accounts" to access the "Facebook advertising network." Xu Jieyun, *Facebook, by 3000 adSage pull Chinese business enterprise investment and advertising*, Jing Division, FIRST FINANCIAL DAILY (Feb. 3, 2012), *available at* tech.qq.com/a/20120203/000029.htm (last visited Sept. 11, 2012) (translated from original Chinese (Simplified Han)).  As such, adSage is a vital conduit for Chinese manufacturers and wholesalers who seek to advertise their goods – some of them counterfeit – on Facebook.

62.    AdSage caters directly to Chinese businesses hoping to make money from Western customers through Facebook, reaping millions of dollars for creating and placing ads on behalf of Chinese businesses – legitimate and illegal alike.  For instance, an article published in the South China Morning Post describes adSage's efforts on behalf of retailers in China seeking to advertise on Facebook and the enormous value of the market for Chinese retailers:

> When it comes to tapping into the world's largest social media website, with 845 million potential customers, mainland advertisers aren't going to let a little obstacle like government censorship get in their way.
>
> The potential for profits by reaching out to Facebook's legions of regular users outweighs the risks and hassles of advertising with an online behemoth that is blocked on the mainland.  That's the thinking of companies such as adSage, a Beijing-based online advertising firm that began a commercial partnership with Facebook in 2010.
>
> Late last year, adSage started helping mainland firms open Facebook accounts, while also offering the firms guidance on managing advertising campaigns on the networking site.  Beijing has banned Facebook, largely out of fears it could be used as a rallying point for dissidents.
>
> Facebook can be accessed on the mainland by using special software that allows internet users to circumvent the Great Firewall: "China is a large potential market for Facebook, the company said on February 2 in its US Securities and Exchange filing for an initial public offering.  We continue to evaluate entering China.

This is not the first time the company has publicly shown interest in the mainland market. Facebook chief executive Mark Zuckerberg, 27, visited Beijing in 2010 and toured top internet companies in town. The trip was widely seen as a move to seek business opportunities.

We can start to figure out the right partnerships we would need to succeed in China on our terms, Zuckerberg said later in a speech at Stanford University.

The company could not be reached immediately for comment.

Based on the number of user visits, Facebook is the world's second-most-popular website, trailing only Google, according to the Alexa web-information company. China's Baidu ranks fifth.

Businessmen such as adSage boss Tang Zhaohui see the potential, even now, of reaching out to people on Facebook.

Most Chinese advertisers [on Facebook] are from the gaming, education and tourism industries, Tang told the Sunday Morning Post. The number of advertisers has tripled since the business started last year.

He said about 3,000 companies used adSage's Facebook services, though he declined to name them. The company's media manager, Chen Tingting, explained that putting advertisements on Facebook is still a sensitive issue on the mainland, adding that they want to keep a low profile on this.

However, Tang said one of their largest advertisers on Facebook, from the computer gaming industry, might spend more than US$1 million a month to advertise on the site, making the company one of the largest advertisers globally on Facebook.

None of the advertisements posted by mainland companies had anything to do with politics – they were simply aimed at Western customers, he said.

The education companies want to attract more people to learn Chinese, while the tourism firms want Americans to use their service to book flights and hotels; and that why they come to us.

Acknowledging Facebook's difficulties in entering the Chinese market, Tang said commercial co-operation [with mainland firms] could be a good start.

Facebook takes the Chinese market seriously, he said. They can't do marketing out in the open, but they frequently visit big advertisers in private with us.

Facebook opened a sales office in Hong Kong early last year, giving the company its second office in Asia after Singapore. The office is strategically located to serve both the Hong Kong and Taiwanese markets, and potentially mainland China.

> Because it offers its service free to users, Facebook's income comes largely from advertising revenue, which it said reached US$943 million in the fourth quarter of last year, accounting for 83 per cent of the company's total revenue in that period.
>
> Mainland companies don't have a big impact on those numbers, but analysts predict that could change as the advertising market continues to boom on the mainland.

Keith Zhai, *Firms Ignore Ban and Run Facebook Ads,* SOUTH CHINA MORNING POST, Feb. 26, 2012, *available at* http://scmp.com.article.993732/firms-ignore-ban-and-run-facebook-ads (last visited October 9, 2012).  As the above article illustrates, the fact that China blocks internet access to Facebook makes it easy for counterfeiters to achieve a certain amount of anonymity by using intermediaries such as adSage.

      63.     AdSage's contacts with the counterfeiters' websites are also documented through the use of further intermediaries that take a role in advertising counterfeit merchandise on Facebook.  AdSage's Chinese website, http://www.adsage.cn/, resides on the servers of a web design and hosting company known as Hichina Zhicheng Technology Ltd. ("HiChina"), located in China.  The same company, HiChina, serves as the registrar and administrator for a number of the counterfeiters' websites described herein, such as nflnhlshopnet.com and superbjerseys.com. *See* **Figure 13** (registrar information for adSage's Chinese website); **Figure 13.1** (registrar information for superjerseys.com).

Figure 13

 **Adsage.cn Reverse IP / Reverse DNS lookup results**

Our reverse IP / reverse DNS lookup tool is an easy way to view websites hosted on a given IP address.

Enter an IP address or domain name and receive a list of domains hosted on that IP address.

| www.adsage.cn | Reverse IP |

(Domain, Host or IP address)

**Adsage - www.Adsage.cn**

**Adsage Title:**
adSage??????????????????????????

**Adsage Keywords:**
none

**Adsage Description:**
adSage?????????????????????????????????????????SEM?SEO??????????????????????????????????

**Adsage IP:**
112.125.57.115

**Adsage server location:**
Beijing in China

**Adsage ISP:**
HiChina Web Solutions (Beijing) Limited

IP: 112.125.57.115
IP Country: 🇨🇳 China
This IP address resolves to ip112.hichina.com[Whois] [Trace]

Figure 13.1

**WHOis.net** ℠

Your Domain Starting Place...

Type here for whois, domain and keyword results

| Whois Lookup | Domain Name Search | Domain Keyword Search | Expired Domain Names |

**superbjerseys.com is not available***

superbjerseys.net    superbjerseys.org

WHOIS information for superbjerseys.com:***

[Querying whois.verisign-grs.com]
[Redirected to grs-whois.hichina.com]
[Querying grs-whois.hichina.com]
[grs-whois.hichina.com]
Domain Name .................. superbjerseys.com
Name Server .................. dns1.3366dns.com
                              dns2.3366.com.cn
Registrant ID ................ hc179280280-cn
Registrant Name ............... Cai LiMing
Registrant Organization ........ Cai LiMing
Registrant Address ............ Guangdong province shenzhen baoan district xixiang all 10 huangtian clock house

Domain
Whois
Whois
DIG Lo

Web A
Ping
Your IP
Name
IP Addr
About
SEO Ar
Alexa R
Alexa R
Compa
Total G

Websit
CSE H
W3C H
CSS V
Robots.txt Validator

VERIO
An NTT Communications Company

VERIO
Doma
jus

FREE
FREE
FREE

sea

Similar D
superbj
exquisit

Name Server: DNS2.3366.COM.CN
Status: ok
Updated Date: 20-jan-2012
Creation Date: 30-dec-2011
Expiration Date: 30-dec-2012

>>> Last update of whois database: Tue, 18 Sep 2012 03:59:35 UTC <<<

NOTICE: The expiration date displayed in this record is the date the registrar's sponsorship of the domain name registration in the registry is currently set to expire. This date does not necessarily reflect the expiration date of the domain name registrant's agreement with the sponsoring registrar. Users may consult the sponsoring registrar's Whois database to view the registrar's reported date of expiration for this registration.



Copyright © 1999-2011

64.    The South China Morning Post also links adSage to another retailer of counterfeit NFL merchandise, Defendant DHgate.com.  As the article illustrates, DHgate.com is heavily engaged in Facebook marketing and targeting of customers:

Joining adSage in recognising the benefits of doing business on Facebook is DHgate, an online trading platform with offices across the mainland.  Hu Hao, a

marketing specialist for DHgate.com, noting Facebook's size and global penetration, said his company's core markets included the United States and Britain, making the website the perfect platform to reach customers.

DHgate started advertising on Facebook in 2010, hiring a team of social media professionals to explore user trends on Facebook in order to devise strategies to raise brand awareness and engage consumers directly.

The company now has more than 22,000 'Likes' on its Facebook page.

'Facebook serves as an alternate channel for the company's PR,' Hu said. 'We have key individuals within the community who were actively answering the questions of other community members on behalf of us. It is a great dynamic.'

But like adSage, DHgate needs special software to access it own Facebook page on the mainland.

'Our Facebook users are all overseas buyers based outside China, so domestic policies were never a factor for us,' Hu said.

In October 2010, during his address at Stanford, Zuckerberg raised a key question that has yet to be answered. 'How can you connect the whole world if you leave out a billion people?'

Keith Zhai, *Firms Ignore Ban and Run Facebook Ads*, SOUTH CHINA MORNING POST (Feb. 26, 2012).

65.    As **Figure 14** shows, DHgate.com offers cheap, unlicensed NFL jerseys for sale on both a wholesale and retail basis, marketing them through Facebook:

///

///

///

///

///

///

///

///

///

///

**Figure 14**



66.     As well as advertising on Facebook, DHgate.com also maintains a web page on

Facebook, as shown in **Figure 15**:

**Figure 15**



DHgate.com advertises the jerseys it sells as "Elite" jerseys; however, licensed Nike Elite NFL

jerseys carry a price of about $295, compared with the $9.99 - $19.99 that DHgate.com charges. Moreover, while most of the pictures DHgate.com shows on its website are careful not to include any trademarked logos, it is clear that the logos will be added to the jersey shipped to the customer, as the website states: "Team logo displayed on both sleeves [;] patch sewn at the point in the front." The "patch sewn at the point in the front" refers to the NFL shield which appears at the "point" of an authentic Nike Elite Jersey.

67.    In addition to selling unlicensed NFL merchandise directly through its website, DHgate.com also acts as a wholesaler, providing links to other retailers selling counterfeit jerseys. For instance, a link on one DHgate.com web page takes the potential customer to external eBay auctions and websites such as http://stores.chosenjerseys.com/, which offers for sale what purport to be authentic Nike Elite jerseys. However, as this description of a Buffalo Bills jersey bearing the name of Mario Williams makes clear, these are counterfeits: "Mario Williams Buffalo Bills #94 Authentic / Elite class 2012 Jersey blue *Authentic class NFL Jersey just like Worn by Player On-Field* - All Numbers, Logos and Names are sewn on and embroidered - Individual twill or dazzle letters for player"s[sic] name - Applique team name and logo at the chest or sleeves (where applicable) - Made of 100% heavyweight mesh nylon." *See* ChosenJerseys Mario Williams Jersey, http://stores.chosenjerseys.com/-strse-250/Mario-Williams-Buffalo-Bills/Detail.bok (last visited Sept. 17, 2012). Among other things, Nike NFL Elite jerseys are *not* made of "100% heavyweight mesh nylon." As the NFL's website states, such a jersey is made of: "Fabric: BODY: 100% POLYESTER MESH: 88% POLYESTER/12% SPANDEX SLEEVE INSETS: 100% NYLON." *See, e.g.,* NFL Shop Men's Carolina Panthers Elite Jersey, http://www.nflshop.com/product/index.jsp?productID=13082136 (last visited Sept. 17, 2012).

68.    But for the assistance of companies like adSage and DHgate.com, it would be nearly impossible for counterfeiters to access Facebook in order to advertise and sell their illegal goods.

**FIRST CAUSE OF ACTION**
**(Unfair Competition Pursuant to the Lanham Act, 15 U.S.C. § 1125(a)**
**Against All Defendants)**

69.     Plaintiffs, individually and on behalf of the Class, hereby restate, re-allege and incorporate by reference the paragraphs stated above in this Complaint as though fully set forth herein.

70.     Defendants have made false and misleading statements in advertisements, promoting counterfeit merchandise purporting to be officially licensed by the NFL and other trademark holders.  These advertisements are used in commerce and contain words, terms, names and symbols of the NFL and other trademark holders.

71.     Defendants play a critical role in misleading consumers with these false advertisements by facilitating, promoting and/or causing the placement of the false advertisements on the Facebook pages of businesses selling authentic, NFL-licensed merchandise as well as placing the false advertisements adjacent to photos and text depicting or referencing authentic NFL merchandise.  Defendants also enable and promote the targeting of consumers who have stated or otherwise indicated a preference for purchasing authentic NFL goods with these counterfeit ads.  By their conduct, Defendants have materially contributed to the false designation of the origin of the counterfeit merchandise contained in the advertisements and the creation of the misleading descriptions or representations of fact regarding the nature of the goods advertised.

72.     The false and misleading statements made by Defendants in advertising the counterfeit merchandise purporting to be officially licensed by the NFL have actually deceived or have the capacity to deceive consumers in the United States who use Facebook's website as to

the origin, sponsorship, or approval of the counterfeit goods being marketed in the advertisements discussed herein.

73.    The false and misleading statements made by Defendants in advertising the counterfeit merchandise purporting to be officially licensed by the NFL were and are material and likely to influence the purchasing decisions of consumers in the United States using Facebook's internet website.

74.    Facebook has continued to allow the other Defendants to place advertisements on its website, despite the fact that Facebook had direct and/or constructive knowledge that the advertisements for counterfeit goods discussed herein were being used to violate the laws of the United States and infringe the trademarks of the NFL and various other entities through the sale of counterfeit merchandise.

75.    The false and misleading statements made in advertisements created by Defendants for counterfeit merchandise purporting to be officially licensed by the NFL occurred in, and had an effect on, interstate commerce.

76.    As a direct and proximate result of the unlawful acts alleged herein, Plaintiff and other members of the Class have been damaged in their businesses in excess of $5,000,000.

77.    Plaintiff has no adequate remedy at law.

## SECOND CAUSE OF ACTION
### (Violation of the New Mexico Unfair Practices Act,
### N.M. Stat. Ann. § 57-12-1 *et seq.* ("NMUPA")—Against All Defendants)

78.    Plaintiff, individually and on behalf of the Class, hereby restates, re-alleges and incorporates by reference the paragraphs stated above in this Complaint as though fully set forth herein.

79.    The NMUPA provides that: "Unfair or deceptive trade practices and unconscionable trade practices in the conduct of any trade or commerce are unlawful."  N.M.

Stat. Ann. § 57-12-3.  The NMUPA defines "unfair or deceptive trade practice" to include false

advertising:

'[U]nfair or deceptive trade practice' means an act specifically declared unlawful pursuant to the Unfair Practices Act [57-12-1 NMSA 1978], a false or misleading oral or written statement, visual description or other representation of any kind knowingly made in connection with the sale, lease, rental or loan of goods or services or in the extension of credit or in the collection of debts by a person in the regular course of the person's trade or commerce, that may, tends to or does deceive or mislead any person and includes:

(1) representing goods or services as those of another when the goods or services are not the goods or services of another;

(2) causing confusion or misunderstanding as to the source, sponsorship, approval or certification of goods or services;

(3) causing confusion or misunderstanding as to affiliation, connection or association with or certification by another;

(4) using deceptive representations or designations of geographic origin in connection with goods or services;

(5) representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation or connection that the person does not have;

(6) representing that goods are original or new if they are deteriorated, altered, reconditioned, reclaimed, used or secondhand;

(7) representing that goods or services are of a particular standard, quality or grade or that goods are of a particular style or model if they are of another;

(8) disparaging the goods, services or business of another by false or misleading representations ... .

N.M. Stat. Ann. § 57-12-2(D)(1)-(7).

80.    The NMUPA further defines an unconscionable trade practice as follows:

'[U]unconscionable trade practice' means an act or practice in connection with the sale, lease, rental or loan, or in connection with the offering for sale, lease, rental or loan, of any goods or services, including services provided by licensed professionals, or in the extension of credit or in the collection of debts that to a person's detriment:

- 50 -

(1) takes advantage of the lack of knowledge, ability, experience or capacity of a person to a grossly unfair degree; or

(2) results in a gross disparity between the value received by a person and the price paid.

N.M. Stat. Ann. § 57-12-2(E).

81.     Defendants' actions of marketing, advertising and selling counterfeit goods as officially licensed NFL merchandise fit within the definitions and scope of the NMUPA, and thereby violate the statute.   Defendants' use of the Facebook Sponsored advertisements described herein is an "unfair or deceptive trade practice" as defined in N.M. Stat. Ann. § 57-12-2(D)(1)-(7).  Among other things, Defendants have engaged in deceptive practices and violated the NMUPA by:  (1) representing that the counterfeit goods being advertised have characteristics that they do not have; (2) deliberately causing confusion as to the authenticity, source, sponsorship, approval and certification of the merchandise they sold; (3) deliberately causing confusion and misunderstanding as to the affiliation, connection and association of the goods with the NFL and its licensees; (4) using deceptive representations and designations of authenticity intended to imply that the goods are authorized by the NFL and its licensees; (5) falsely representing that the counterfeit goods have sponsorship, approval and characteristics of officially licensed NFL merchandise; (6) falsely representing that the counterfeit goods are of the highest quality and are unaltered from those sold by the NFL and its licensees; (7) representing that the counterfeit goods are of a standard, quality, or grade when they are of another, and (8) disparaging the goods, services and business of Plaintiff and other members of the Class by falsely representing that the goods in the Facebook Sponsored advertisements are of the same or superior quality to those sold by Plaintiff and other members of the Class.

82.     The advertisements for counterfeit goods that are complained of herein and the associated misstatements were made knowingly by Defendants and with the intent to deceive.

Defendants are aware of the counterfeit nature of the goods being marketed by adSage, DHgate.com and the Doe Defendants and have taken no steps to remediate these violations of the law.

83.     Further, Defendants engaged in unconscionable trade practices in that the method and schemes used by Defendants to advertise the counterfeit merchandise described herein are intended to take advantage of consumers' lack of knowledge and expertise in identifying authentic merchandise produced by the NFL and its licensees, which results in a disparity between the value received by consumers and the price paid for the counterfeit merchandise.

## RELIEF REQUESTED

**WHEREFORE** Plaintiff, by and through its, counsel, respectfully prays that that this Court grant the following relief:

1.     Determining that this action is maintainable as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiff as class representative;

2.     Awarding pecuniary damages, pre-judgment interest, costs of suit and attorneys' fees;

3.     Awarding exemplary and punitive damages;

4.     Awarding injunctive relief, including a preliminary injunction;

5.     Awarding such other and further relief as the Court deems just and proper.

DATED:     October 22, 2012

Respectfully submitted,

BRANCH LAW FIRM

Turner W. Branch
Adam T. Funk
2025 Rio Grande Blvd. NW
Albuquerque, New Mexico 87104
Telephone:  505/243-3500
Facsimile:   505/243-3534
Email:  tbranch@branchlawfirm.com
        afunk@branchlawfirm.com

WOLF HALDENSTEIN ADLER
  FREEMAN & HERZ LLP
Francis M. Gregorek
Betsy C. Manifold
Rachele R. Rickert
750 B Street, Suite 2770
San Diego, CA 92101
Telephone: 619/239-4599
Facsimile:  619/234-4599
Email:   gregorek@whafh.com
         manifold@whafh.com
         rickert@whafh.com

WOLF HALDENSTEIN ADLER
  FREEMAN & HERZ LLP
Gregory M. Nespole
Patrick H. Moran
270 Madison Avenue
New York, NY 10016
Telephone: 212/545-4600
Facsimile:  212/545-4653
Email:  moran@whafh.com

*Counsel for Plaintiff*

- 53 -

JS 44 (Rev. 12/07)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

INKIES SPORTS, INC. (d/b/a KRYSTAL'S NFL SHOPPE), on behalf of itself and all others similarly situated,

**(b)** County of Residence of First Listed Plaintiff    Bernalillo
(EXCEPT IN U.S. PLAINTIFF CASES)

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
Turner W. Branch, Branch Law Firm, 2025 Rio Grande Blvd. NW. Albuquerque, NM 87104; Tel: (505) 243-3500

## DEFENDANTS

FACEBOOK, INC., ADSAGE CORPORATION, DHGATE.COM, and DOE DEFENDANTS 1-100,

County of Residence of First Listed Defendant    San Mateo
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

Attorneys (If Known)

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

- ☐ 1 U.S. Government Plaintiff
- ☒ 3 Federal Question (U.S. Government Not a Party)
- ☐ 2 U.S. Government Defendant
- ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☒ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury - Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 480 Consumer Credit |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 490 Cable/Sat TV |
| | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other | | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | **LABOR** | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 160 Stockholders' Suits | ☒ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 190 Other Contract | | | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 890 Other Statutory Actions |
| ☐ 195 Contract Product Liability | | | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 891 Agricultural Acts |
| ☐ 196 Franchise | | | ☐ 740 Railway Labor Act | ☐ 864 SSID Title XVI | ☐ 892 Economic Stabilization Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | ☐ 865 RSI (405(g)) | |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | **Habeas Corpus:** | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 895 Freedom of Information Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | **IMMIGRATION** | | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 550 Civil Rights | ☐ 463 Habeas Corpus - Alien Detainee | | ☐ 950 Constitutionality of State Statutes |
| | ☐ 440 Other Civil Rights | ☐ 555 Prison Condition | ☐ 465 Other Immigration Actions | | |

## V. ORIGIN (Place an "X" in One Box Only)

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from another district (specify)
- ☐ 6 Multidistrict Litigation
- ☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
NM Stat. Ann. Sec. 57-12-3 + 15 USC § 1051 et. seq.

Brief description of cause:
class action on behalf of retailers and wholesalers due to counterfeit goods advertised on internet

## VII. REQUESTED IN COMPLAINT:

☒ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $ in excess of $75,000 & preliminary injunction

CHECK YES only if demanded in complaint:
JURY DEMAND: ☐ Yes  ☒ No

## VIII. RELATED CASE(S) IF ANY
(See instructions)

JUDGE

DOCKET NUMBER

DATE    10/22/12

SIGNATURE OF ATTORNEY OF RECORD

## FOR OFFICE USE ONLY

RECEIPT #          AMOUNT          APPLYING IFP          JUDGE          MAG. JUDGE